**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TONYA L. KECK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:11-cv-565 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

**I.      Introduction**

Pending now before the court are cross-motions for summary judgment based on the administrative record: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 13) and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 14).  Plaintiff, Ms. Tonya L. Keck, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied her application for supplemental security income ("SSI") and disability insurance benefits ("DIB") under title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-405(g); 1381-1383(f).

**II.      Background**

**A.      Facts**

Plaintiff was born on September 3, 1977 and was 31 years old at the time of her administrative hearing.  (R. at 8, 132).  Plaintiff graduated from high school and did not

attend any special education classes.  (R. at 24, 141).   She last worked in 2000, as a

waitress.  Plaintiff has also previously worked as a cashier and a clerk.  (R. at 138).  At the

time of the administrative hearing, Keck resided with her fifty-year-old mother, who does

not work and receives disability benefits for a mental condition.  (R. at 30).  Plaintiff has a

driver's license and goes grocery shopping.  She also downloads music from the Internet

and plays computer games.  (R. at 31-34).

Plaintiff alleges disability as of June 1, 1997, due to mood and personality

disorders.  (R. at 132, 137).  The record reflects that Plaintiff has not engaged in substantial

gainful activity ("SGA") since December 14, 2006, the day she filed an application for SSI.

 The parties do not dispute that Plaintiff suffers from mood and personality disorders.

Likewise, there is no dispute that Plaintiff has not engaged in SGA since the application

date.  (R. at 10).

Plaintiff was hospitalized for one week in November 1996 for depression.  She was

stabilized with Paxil and Zoloft.  (R. at 152, 324).  Plaintiff was discharged with

instructions to continue taking Zoloft and to attend counseling sessions at Community

Counseling Center.  (R. at 324).  There is no evidence in the record that Keck followed

those instructions.  (R. at 152).  There is no medical evidence that Plaintiff was examined

by a physician again until February 2004, when she had an appointment with Dr. Richard

Martsolf at Primary Health Network.  In his progress notes from that appointment, Dr.

Martsolf noted that he had not seen Plaintiff for over three and a half years, that she had not

sought treatment from any other source during that time, and that she had not taken any medication during that period. Dr. Martsolf recorded that Keck was "applying for SSD on the basis of depression," and that "we'd seen her for this almost six years ago." (R. at 152). Plaintiff acknowledged that the Zoloft she'd been prescribed in November 1996 helped her condition, but that she stopped taking the medication when her supply ran out. Plaintiff told Dr. Martsolf that she was living with her grandmother "who was doing counseling for her," and that she had "just been kind of doing nothing" with her time. (R. at 152). Dr. Martsolf prescribed Plaintiff Lexapro and Zyprexa for her depression. (R. at 152). Two weeks later, Dr. Martsolf saw Keck again. Plaintiff reported minimal improvement, but seemed "controlled and pleasant." (R. at 151). Dr. Martsolf increased the dosage of her medications. (R. at 151). Plaintiff had an appointment with Dr. Martsolf three weeks later, and he documented that she responded well to her medication and had "no particular complaints." (R. at 150). The record reflects that Plaintiff did not seek or receive additional mental health treatment until October 2006. (R. at 219).

In October 2006, Plaintiff began to receive treatment from psychiatrist Dr. Patel at Primary Health Network. [1] Dr. Patel noted that Plaintiff had difficulty handling her anger, and he prescribed her Geodon and Abilify. (R. at 219). Keck started individual counseling a short time later and denied having any physical problems. (R. at 214-16). A social

---

[1] Dr. Patel's first name is not listed within the record.

worker named Kara[2] from Primary Health Network counseled Plaintiff, and her initial session notes reflected positive responses: Keck's mood was stable, her affect was bright, and she maintained good eye contact. (R. at 216). Plaintiff returned to Dr. Patel in November and December of 2006, and he adjusted her medication regimen to include Concerta. (R. at 217-18). Subsequent counseling notes documented further improvement in Plaintiff's condition; Keck stated that her medications "seem to be working well," her affect remained bright, and she "denied recent mood swings or anger outbursts." (R. at 215). She also stated that she had a boyfriend of three months and was "talking about marriage." (Id). Plaintiff did not return to see Dr. Patel after December 2006. There is no evidence in the record that Plaintiff sought or received additional mental health treatment until September 2008, when she was counseled at Community Counseling Center. (R. at 337).

In November 2007, Plaintiff received a consultative psychological evaluation specifically for the purpose of disability evaluation, which was conducted by Dr. Fred Gallo, Ph.D. (R. at 303). During that evaluation, Keck told Dr. Gallo that her prescription medication had not improved her condition, and she "emphasized that it is still not working." (R. at 304). Dr. Gallo observed that Plaintiff presented with inappropriate affect, disheveled attire, and immaturity. Plaintiff told Dr. Gallo that while in high school, she received "poor grades" and "was in some special classes." (Id.) Dr. Gallo had Plaintiff

---

2 kara's last name is in the record in the form of her signature, but it is not discernible.

take a Wide Range Intelligence Test ("WRIT"), which is an individually administered intelligence test. (R. at 304). Results of the WRIT indicated that Plaintiff had a non-verbal score of 54, which qualified in the range of moderate to mild mental retardation. Dr. Gallo determined that Plaintiff's general WRIT intellectual functioning score of 69 qualified her in the range of mild mental retardation. However, Dr. Gallo had Plaintiff perform a Wide Range Achievement Test-3 ("WRAT-3"), and results revealed that Plaintiff had "post high school reading achievement. These results . . . are higher than what would be predicted on the basis of the WRIT verbal scales." (R. at 304). In addition, Plaintiff's performance on the WRAT-3 Arithmetic test indicated that her math achievement was at an eighth grade level. Dr. Gallo also had Plaintiff take the Minnesota Multiphasic Personality Index-2 test ("MMPI-2"). Results from the MMPI-2 suggested that Plaintiff "experiences considerable mental confusion," but because of significant elevations in her responses, Dr. Gallo deemed standing interpretation of this assessment to be inappropriate. (R. at 305). Dr. Gallo used "self-report" instruments to determine that Plaintiff suffered from severe depression and mild anxiety. (R. at 305). He diagnosed Plaintiff with bipolar disorder and mild mental retardation, and assigned her a global assessment of functioning ("GAF") score of 40, which is a score indicative of serious difficulty in functioning in multiple areas. (R. at 306). Dr. Gallo opined that Plaintiff's mental impairment fulfilled the requirements of Adult Listing 12.04, Affective Disorder, "in that she evidences a disturbance in mood characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation,

decreased energy, feelings of worthlessness, concentration deficits, and possible paranoid thinking." (R. at 306). Dr. Gallo also determined that Plaintiff's condition satisfied the requirements of Listing 12.05, Mental Retardation. He concluded that Plaintiff was not able to enter into the competitive labor market at that time. (R. at 306).

Six weeks prior to Plaintiff's disability hearing, in September 2008, Plaintiff sought mental health treatment at Community Counseling Center. (R. at 312). Plaintiff's therapist, Ms. Georgella Groover, diagnosed her with depressive disorder and assigned her a GAF score of 65, indicative of mild symptoms. (R. at 313, 316). Plaintiff's depressive symptoms--such as anger, fatigue, and hyperactivity--were noted, but were documented as based solely on her subjective reports. (R. at 313-17). A mental status examination reflected that Plaintiff functioned at a below-average range of intelligence, had moderately impaired judgment, a moderately impaired memory, and a severely diminished ability to think. (R. at 314). Keck's response to treatment was noted as "good," and the likelihood that she'd adhere to current treatment was "good" as well. (R. at 315).

After Keck's administrative hearing, the ALJ reviewed the substantial evidence in the record and determined that Dr. Gallo's evaluation of Plaintiff was "extremely inconsistent with the positive response to treatment and significant improvement in symptoms, as well as the essentially normal clinical findings as, documented in contemporaneous treatment notes of her treating psychiatrist and counselor, as well as with earlier medical records, which contain no indication or diagnosis of mental retardation."

(R. at 15). The ALJ gave virtually no weight to Dr. Gallo's opinion that Plaintiff's impairments satisfied the requirements of Adult Listings 12.04 and 12.05, and determined that Plaintiff was not "disabled" under the meaning of the Act. (R. at 15, 20).

**B.  Procedural History**

Plaintiff filed a previous application for SSI on February 17, 2004, which was ultimately denied by an Administrative Law Judge ("ALJ") on August 31, 2006. Plaintiff did not appeal that decision and, under the doctrine of *res judicata*, the issue of Plaintiff's disability has been finally and unfavorably decided through August 31, 2006. (R. at 8). Plaintiff filed the current application for SSI on December 14, 2006, in which she claimed total disability since June 1, 1997. An administrative hearing was held on October 30, 2008, before ALJ Douglas Cohen. Plaintiff was represented by counsel and testified at the hearing. Ms. Tania Shullo, a vocational expert, and Ms. April Williams, Plaintiff's aunt, also testified. (R. at 8).

On February 26, 2009, the ALJ rendered an unfavorable decision to Plaintiff in which he found that Plaintiff has "the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant is limited to simple, routine, repetitive tasks, not performed in a fast-paced work production environment, and involving only simple, work-related decisions, and, in general, relatively few work place changes," and, therefore, was not "disabled" within the meaning of the Act. (R. at 11, 20).

The ALJ's decision became the final decision of the Commissioner on March 17, 2011, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ. Plaintiff now seeks judicial review of the decision of the ALJ. The parties' cross-motions for summary judgment are ripe for disposition.

## III. Legal Analysis

### A. Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Capato v. Commissioner of Social Security*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Commissioner of Social Security*, 625 F.3d 798 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or

equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Commissioner of Social Security*, 347 F.3d 541, 545-46 (3d Cir. 2003) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Halter,* 247 F.2d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways:

(1) by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell,* 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

(2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell,* 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff

from returning to his or her former job.  *Newell,* 347 F.3d at 545-46; *Jones,* 364 F.3d at 503.  Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Rutherford*, 399 F.3d at 551; *Newell,* 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

When a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment.  *Diaz v. Commissioner of Social Security*, 577 F.2d 500, 502 (3d Cir. 2010); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

In this case, the ALJ determined that Plaintiff did not have a Listed Impairment within the meaning of the Act at the third step of the sequential evaluation process.  (R. at 10).  At step five, the ALJ concluded that Plaintiff has "the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant is limited to simple, routine, repetitive tasks, not performed in a fast-paced work production

environment, and involving only simple, work-related decisions, and, in general, relatively few work place changes," and that Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 11, 19).

**B.**     Discussion

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Common of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999).

Plaintiff contends that the ALJ erred in (1) ignoring the objective test results and evaluation report of her consultative psychologist, Dr. Gallo; (2) failing to evaluate the applicability of Listing 12.05; and (3) determining that she did not have a disability pursuant to Listing 12.04. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence. The Court agrees with the Commissioner and will therefore grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

1. *The ALJ Properly Evaluated the Objective Test Results and Evaluation Report of Plaintiff's Consultative Psychologist, Dr. Gallo.*

Plaintiff contends that the ALJ ignored the objective test results and evaluation report of Dr. Gallo, her consultative psychologist. Dr. Gallo performed a psychological evaluation of Plaintiff in November 2007, specifically for disability purposes. Dr. Gallo's evaluation of Plaintiff spanned a two day period and consisted of a clinical interview and a battery of diagnostic tests, including an intelligence test. (R. at 303). Plaintiff alleges that the ALJ attacked Dr. Gallo's credibility and replaced the doctor's findings with his own lay opinions. Plaintiff also alleges that the ALJ attempted to discredit her. Plaintiff states that there is no evidence to support a contrary evaluation of Dr. Gallo's test results. The Court finds this argument to be without merit.

After performing Plaintiff's consultative evaluation, Dr. Gallo opined that her mental impairments satisfied the requirements of Listings 12.04, Affective Disorder, and 12.05, Mental Retardation. (R. at 306). During that evaluation, Plaintiff's presentation and testimony were notably divergent from the clinical findings and progress notes documented by her more recent treating psychiatrist and counselor. While Dr. Gallo found that Plaintiff exhibited disheveled attire, inappropriate affect, and immaturity, contemporaneous notes from Kara, Plaintiff's counselor at Primary Health Network, documented her good mood, bright affect, and stable eye contact. (R. at 216, 304). Though Plaintiff told Kara that her

"medications seem to be working well," Plaintiff told Dr. Gallo that her prescription medication "does not work." (R. at 215, 304).

The ALJ did not attack the credibility of Dr. Gallo as Plaintiff alleges. The ALJ simply noted the discrepancies in Dr. Gallo's opinion, Plaintiff's testimony, Plaintiff's school performance, and Plaintiff's medical records. Dr. Gallo's intelligence test results indicated that Plaintiff's non-verbal and general scores, 54 and 69, respectively, were within the range of mild mental retardation. (R. at 304). The ALJ observed that these results contradicted records from Plaintiff's schooling period, which had not indicated any similar intellectual deficits, and Plaintiff's testimony that she graduated from high school without taking special classes. (R. at 14, 24, 141). In addition, the ALJ noted that Plaintiff's performance in the WRAT-3 test showed "reading ability at a post high school level, higher than Dr. Gallo's intelligence scores would have predicted, and math achievement was in the average range." (R. at 14). The ALJ stated that these discrepancies were "further emphasized by admitted invalidity of the claimant's scores" on the MMPI-2 test, "which were deemed invalid based on the fact that claimant's responses showed significant elevations, such that standing interpretation was not appropriate." (R. at 14).

The ALJ found that these discrepancies "cast very serious doubt" on Plaintiff's credibility. (R. at 14). He stated that they raised the possibility that Plaintiff was exaggerating her symptoms in order to obtain SSI, "as she knew this consultative examination was specifically for disability purposes." (R. at 14). It is the responsibility of

the ALJ to determine the credibility of a plaintiff's statements about his or her own disability, and to make findings on credibility. *See Dobrolowsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (stating that an ALJ must furnish "an explanation regarding the relative weight and credibility of the evidence before him"). The ALJ explained the reasons why he did not find Plaintiff credible. Keck testified that she stopped seeing her psychiatrist, Dr. Patel, in December 2006 for a number of reasons. She told Gallo that she did not feel that Dr. Patel was helping her, that the medication he prescribed her made her feel like a zombie, and that she hadn't taken medication in years. (R. at 16, 30, 36, 304). In other testimony, Plaintiff stated that her grandmother, who "counseled" her despite lacking the professional credentials to do so, encouraged her to stop taking her prescription medication. (R. at 16, 36). However, Dr. Patel, Dr. Martsolf, Plaintiff's counselors, and the records from Plaintiff's brief hospitalization in November 2006 all indicate that Plaintiff's depression condition improved with treatment. (R. at 150, 215, 217, 315). In a November 2006 counseling session, Plaintiff stated that she had a boyfriend of three months. (R. at 215). When asked about her boyfriend by the ALJ, Plaintiff stated that she hadn't dated anyone since 2003. After being asked about this discrepancy at the hearing, Plaintiff said, "I don't remember saying that." (R. at 17, 43). However, "when asked by her attorney about past jobs, the claimant had no difficulty recollecting not only a long list of jobs, but the reasons she quit the various jobs." (R. at 17, 34-35).

The ALJ reviewed Plaintiff's testimony and stated that many of the problems she encountered at her previous work placements stemmed from the fact that she simply didn't like performing her assigned job duties. (R. at 18). When asked why she quit her job at McDonalds after working there for six months, Plaintiff said, "I got annoyed because they were only keeping me on the French fries and stuff." (R. at 17, 35). Plaintiff testified that she quit her job as a waitress in 2000 because she "was tired of having to do everyone else's work for them." (R. at 24). Plaintiff said that she was fired from Long John Silver's after working there for one year "because a customer said that I had given her an attitude, but I hadn't. I was very nice to her, but they still fired me." (R. at 35). Plaintiff stated that she had difficulty working because she has "problems with concentration, anger, and authority." (R. at 16). However, Keck also testified that her concentration problems, which occur only "every so often," do not prevent her from driving a car, going grocery shopping, or using the internet to play computer games and download music." (R. at 17, 37).

When evaluating the results of Dr. Gallo's consultative evaluation, the ALJ considered all of the evidence in the record, including an affidavit that Plaintiff's aunt, April Williams, submitted in November 2008. (R. 318-19). The affidavit "recounted that the claimant had a number of symptoms and problems," such as difficulty in past school settings, a faulty memory, and the need for frequent redirection when attempting tasks. (R. at 17). The ALJ reviewed the affidavit but gave it minimal weight because "the alleged problems noted seem to have occurred prior to the one at issue, and none of the objective medical

evidence in record . . . corroborates the claimant's aunt's statements." (R. at 17). The ALJ concluded that the conflicting testimony concerning Plaintiff's condition cast serious doubt on her credibility. (R. at 17). There is substantial evidence in the record to support this conclusion.

In contrast, the ALJ gave substantial weight to the opinions of Plaintiff's most recent treating psychiatrist and counselor. The opinions of a claimant's treating physician are "entitled to substantial and at times even controlling weight . . . these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). Though an ALJ "may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Id.* The ALJ explained why he gave Dr. Gallo's evaluation results virtually no weight; namely, because they were "extremely inconsistent with . . . the essentially normal clinical findings, documented in contemporaneous treatment notes of [Plaintiff's] treating psychiatrist and counselor, as well as with earlier medical records, which contain no indication or diagnosis of mental retardation." (R. at 15). In addition, the ALJ noted that Dr. Gallo's diagnosis of the Plaintiff was based primarily on her "uncorroborated subjective complaints . . . which are

inconsistent with the weight of all substantial evidence in the record." (R. at 15). The ALJ

acknowledged that Dr. Gallo's consultative determinations were supported by some of the

doctor's clinical observations of Plaintiff as well as other diagnostic findings. (R. at 15).

However, substantial evidence in the record supports the determination that the ALJ properly

evaluated Dr. Gallo's report and provided a sufficient explanation for rejecting his opinions.

2. *The ALJ Properly Evaluated the Applicability of Listing 12.05.*

In *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004), the United States Court of

Appeals for the Third Circuit instructed "that there be sufficient explanation to provide

meaningful review of the step three determination." Plaintiff contends that the ALJ erred at

step three by failing to evaluate the applicability of Listing 12.05 to the results of her

consultative psychologist's report. Dr. Gallo evaluated Plaintiff and determined that her

impairments met the requirements of Listings 12.04, Affective Disorder, and 12.05, Mental

Retardation. (R. at 306). Plaintiff contends that the ALJ failed to fully analyze Listing

12.05, merely stating that no physician prior to Dr. Gallo diagnosed Plaintiff as mentally

retarded. The Court also finds this argument to be without merit.

Disability under Listing 12.05 may be established by showing:

"(1) mental incapacity evidenced by dependence upon others for personal needs and

inability to follow directions, such that the use of standardized measures of

intellectual functioning is precluded; (2) a valid verbal, performance, or full scale

IQ of 59 or less; (3) a valid verbal, performance, or full scale IQ of 60 through 70

and a physical or other mental impairment imposing an additional and significant work-related limitation of function; (4) or a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration."

*See* 20 C.F.R. § 404app. 1.

Dr. Gallo's intelligence test results indicated that Plaintiff's non-verbal and general scores, 54 and 69, respectively, were within the range of mild mental retardation, and that these conditions:

"result in marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, deficiencies in concentration, persistence, and pace resulting in frequent failure to complete tasks in a timely manner, and repeated episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms."

(R. at 306). The ALJ observed in detail that these results contradicted Plaintiff's statements that she did not attend special classes in high school, that she spent her days engaged in activities of her choice, that she had concentration problems only "every so often," and that

she quit a number of jobs, not because of her impairments, but because she didn't like performing her assigned duties. (R. at 14, 17-18, 37). Dr. Gallo's opinions contradicted other evidence in the record, which reflected that Plaintiff lacked intellectual deficits. (R. at 14, 141). This evidence includes records from Plaintiff's schooling period, and the results of her performance on the WRAT-3 test, which Dr. Gallo administered and which showed that Plaintiff's readability is at a post high school level and that her math achievement is in the average range. The ALJ also noted that results from Plaintiff's MMPI-2 test, which indicated that she experienced serious difficulty concentrating, were deemed invalid by Dr. Gallo to the extent they contained significant elevations and could not be viewed through standing interpretation. (R. at 14, 304).

The ALJ noted that Dr. Gallo's determination that Plaintiff was mentally retarded was based heavily on Plaintiff's subjective complaints, which were refuted by progress notes from Dr. Patel and Plaintiff's counselor, and which were inconsistent with the weight of all the substantial evidence in the record. (R. at 14, 15, 305). The evidence in the record shows that Plaintiff never received treatment for mental retardation. The ALJ properly considered the applicability of Listing 12.05 and determined that the opinions of Dr. Gallo regarding that Listing deserved virtually no weight, as they were inconsistent with substantial evidence in the record.

3. *The ALJ Properly Determined that Plaintiff did not Have a Disability Pursuant to Listing 12.04.*

A disorder under Listing 12.04, Affective Disorder, is "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § 404app. 1. There is no dispute that Plaintiff suffers from personality and mood disorders. (R. at 10). To qualify as a listed impairment under Listing 12.04, certain requirements must be satisfied. The claimant must suffer from a number of conditions, including, but not limited to: medically documented persistence of anhedonia, appetite disturbance, difficulty concentrating, and hyperactivity. These conditions must result in two of the following: "marked restriction of activities of daily living; marked restrictions of maintaining social functioning; marked restrictions of maintaining concentration, persistence, or pace; or repeated episodes of decompensation." *See* 20 C.F.R. § 404app. 1. After performing Plaintiff's consultative evaluation for disability purposes, Dr. Gallo opined that Keck's depressive symptoms fulfilled the requirements of Listing 12.04, specifically, that her mood disorder resulted in marked restrictions of activities of daily living, of maintaining social functioning, of deficiencies in concentration, and of repeated episodes of decompensation in work-like settings. (R. at 306).

To deny a Plaintiff's claim at step three, an ALJ must ensure that there is "sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505. The ALJ discussed the application of Listing 12.04 to the

evidence in the record and determined that Plaintiff has no "marked" limitations. The ALJ found that Keck has "mild restrictions in activities of daily living and moderate difficulties in social functioning with regard to concentration, persistence, or pace." (R. at 11). Plaintiff contends that the ALJ erred in determining that she has no marked criteria limitations.

A "marked" limitation is one that is "more than moderate but less than extreme." 42 USCA APP., Subpt. P, App. 1. In making his determination that Plaintiff did not have any marked limitations, the ALJ viewed all substantial evidence in the record. He gave virtually no weight to Dr. Gallo's determination that the requirements of Listing 12.04 were satisfied by Plaintiff's condition because, as previously mentioned, Dr. Gallo's evaluation and opinions contained discrepancies and were inconsistent with Keck's testimony and records. In addition, there was substantial evidence for the ALJ to determine that Plaintiff's testimony was not entirely credible. The evidence as a whole showed that Plaintiff, despite her mental impairments, continued to engage in activities of her own choice, such as driving a car to visit her Aunt, going to the grocery store, doing chores around the house, and playing computer games. In addition, Keck testified at her hearing that "she basically quit most jobs, not because she couldn't perform the work, but rather because she did not want to perform the duties or follow instructions." (R. at 17). The ALJ noted that this testimony corroborated Plaintiff's Earnings Record, which lists a number of her past occupations and "shows a very poor work record." (R. at 17). The ALJ stated this "raises considerable questions as to her motivation and desire to work irrespective of any impairment." (R. at 17). The evidence also

shows that Plaintiff sought limited medical attention for her impairments despite having medical insurance, and that she remained stable with the treatment that she did receive. (R. at 11-13). After consideration of all of the evidence in the record, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" as they are not consistent with the substantial evidence in the record, which suggests that Keck has the residual functional capacity to perform unskilled work. (R. at 17). This assessment is "supported by the claimant's documented good response to medication and treatment when compliant and her ability to perform a range of activities." (R. at 17). Therefore, the ALJ's determination that Keck did not have a Listed Impairment pursuant to Listing 12.04 was supported by substantial evidence.

4. *The ALJ Properly Determined that Plaintiff is Not "Disabled" Under the Meaning of the Act.*

In determining Plaintiff's residual functional capacity for unskilled work, the ALJ considered the substantial evidence in the record. Plaintiff has no past relevant work for the purpose of step four of the sequential evaluation process. (R. at 19). The Plaintiff contends that the ALJ erred in giving considerable weight to the September 2008 diagnosis of depressive disorder and GAF score of 65 following Plaintiff's initial psychological evaluation at the Community Counseling Center because the therapist who made this

diagnosis is a "non-physician."   The Plaintiff also contends that the ALJ severely

mischaracterized her treatment history.  The Court finds this argument  to be without merit.

The ALJ explained the reason why he gave substantial weight to Ms. Groover's

determinations: they were supported by objective clinical findings and were consistent with

other substantial medical evidence in the record, including reports from Plaintiff's primary

care physician, Dr. Martsolf, and Plaintiff's most recent treating psychiatrist, Dr. Patel.  (R. at

18).  During Keck's initial visit at Community Counseling Center, Ms. Groover

acknowledged that Plaintiff showed signs of diminished concentration and judgment.  (R. at

314).  The ALJ considered those results and, consequently, limited Plaintiff to employment

requiring only simple tasks and simple work-related decisions.  (R. at 11).

At step five of the sequential evaluation process, the ALJ concluded that there

were a significant number of unskilled, medium jobs in the national economy that Plaintiff

could perform.  (R. at 19).  In making this determination, the ALJ asked the vocational expert

at the hearing, Ms. Shullo, whether jobs exist in the national economy for an individual of

Plaintiff's age, education, work experience, and residual functional capacity.  (R. at 19).  The

vocational expert testified that given all these factors, someone with the Plaintiff's vocational

profile could perform the "requirements of representative occupations such as a washer with

400,000 jobs nationally, as a marker with 500,000 jobs nationally, and as a machine presser

with 91,000 jobs nationally."  (R. at 20).

The ALJ reasonably relied on the vocational expert's testimony, which was based on a hypothetical question that fully accommodated the limitations of Plaintiff that were supported by the record. *See Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999) (stating that a vocational expert's testimony may be relied upon as substantial evidence to support the ALJ's decision as long as the hypothetical presented to the vocational expert "fairly sets forth every credible limitation established by the physical evidence"). The ALJ's findings regarding Plaintiff's limitations were fully supported by the substantial and objective evidence in the record which showed that Plaintiff had a history of minimal and intermittent health treatment and that she exhibited improved attention span, attitude, and concentration with medication. Because the vocational expert identified jobs that Plaintiff could perform based on a hypothetical question that fully accommodated her limitations, substantial evidence supports the ALJ's finding that Plaintiff remained able to perform the representative jobs of washer, marker, and machine presser, and is therefore not "disabled" under the Act. (R. at 20).

IV.        **Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that

Plaintiff is not disabled within the meaning of the Social Security Act, and that she has the ability to perform a reduced range of unskilled, medium work.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.


McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TONYA L. KECK,                          )
                                        )
      Plaintiff,                  )
                                        )
      v.                          )          02:11-cv-565
                                        )
MICHAEL J. ASTRUE,                      )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
      Defendant.                  )

## ORDER OF COURT

    **AND NOW**, this 22nd day of March, 2012, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

    1. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 13) IS

**DENIED.**

    2. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 14)

IS **GRANTED.**

    3.    The Clerk will docket this case as closed.


            BY THE COURT:


            s/Terrence F. McVerry
            United States District  Court Judge

cc:   Richard W. Epstein, Esquire
Ekker, Kuster, McConnell & Epstein
Email: kat@ekmelaw.com

Paul Kovac,
Assistant U.S. Attorney
Email: paul.kovac@usdoj.gov